Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Sep 02 2014, 10:44 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT S.G.:

**CARA SCHAEFER WIENEKE**
Special Asst. to the State Public Defender
Wieneke Law Office
Plainfield, Indiana

ATTORNEY FOR APPELLANT K.G.:

**KIMBERLY A. JACKSON**

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General

**ROBERT J. HENKE**
Deputy Attorney General

**CHRISTINA PACE**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN RE THE MATTER OF Z.G., J.C., and H.H.: Children Alleged To Be Children In Need of Services | ) ) ) ) |
| S.H. (MOTHER) & K.G. (FATHER OF Z.G.) | ) ) |
| Appellants-Respondents, | ) ) |
| vs. | ) No. 52A02-1403-JC-160 ) |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee-Petitioner. | ) ) |

APPEAL FROM THE MIAMI CIRCUIT COURT
The Honorable Timothy Spahr, Judge
Cause No. 52C01-1309-JC-81
Cause No. 52C01-1309-JC-82
Cause No. 52C01-1309-JC-83

September 2, 2014

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

This case involves an appeal from the juvenile court's determination that J.C., born in April 2007, Z.G., born in November 2008, and H.H., born in May 2013, (collectively, the Children), are Children in Need of Services (CHINS). S.H. (Mother) appeals the juvenile court's determination with respect to all of the Children, while Z.G.'s father, K.G. (Father), appeals the determination with respect to Z.G. only.[1]  Mother and Father have filed separate briefs.  Both Mother and Father raise the following issue:

   1.  Was sufficient evidence presented to support the CHINS adjudications?

Additionally, Father raises the following issue:

   2.   Is the dispositional order supported by appropriate findings?

   We affirm.

This case arises out of this family's third contact with the Department of Child Services (DCS).   In 2008, Mother was arrested for possession of paraphernalia, possession of marijuana, and maintaining a common nuisance.   Mother ultimately pleaded guilty to possession of marijuana.  As a result, Mother entered into a program of informal adjustment with the DCS and received in-home counseling.   In 2012, in response to reports the DCS had received, drug screens were conducted on Z.G. and J.C., one of whom tested positive for methamphetamine.   Father also tested positive for methamphetamine at that time.   Mother admitted to the CHINS allegations and participated in parenting classes, drug screens, and in-home counseling.  At the time the 2012 CHINS case was closed, Mother and Father were not living together.

---

[1] J.C.'s and H.H.'s respective fathers do not participate in this appeal.

2

In August 2013, however, Father moved back into Mother's home. By September 4, 2013, Mother had begun to suspect Father was using drugs again. On that date, Mother confronted Father about her suspicions and told him to leave. At the time, all three of the Children were downstairs in the same area as Mother and Father. The confrontation escalated, and Mother threatened to get a knife and hurt Father with it. Father then went to the kitchen, retrieved a knife, handed it to Mother, and told her to hurt him. At that point, Mother told J.C. and Z.G. to go upstairs, but the infant H.H. remained downstairs in his car seat. At some point during the confrontation, Father went outside, and Mother attempted to block his reentry into the home. Father pushed open the door, and Mother punched him in the face. Father then knocked Mother to the ground and pinned her down. When police arrived shortly after the altercation, they found methamphetamine and two syringes in Father's pocket. Father was ultimately arrested for domestic battery, possession of a syringe, possession of methamphetamine, and maintaining a common nuisance.

On September 25, 2013, the DCS filed verified petitions alleging that each of the Children were CHINS due to their exposure to domestic violence and illegal drug use. An evidentiary hearing was held on January 13, 2014, and the juvenile court issued separate orders adjudicating each of the Children as CHINS on January 20, 2014.[2] A dispositional hearing was held on February 19, 2014. The juvenile court issued

---

[2] All three of the orders are nearly identical in substance, except for the references to each child's respective father. Accordingly, for the sake of clarity, we will cite to the order pertaining to Z.G.

3

dispositional orders as to each Child on February 26, 2014.[3] The juvenile court ordered

the Children to remain with Mother and required both Mother and Father to engage in

services. Mother and Father now appeal.

1.

On appeal, Mother and Father both argue that the CHINS adjudication is not

supported by sufficient evidence. Where, as here, a juvenile court enters findings of fact

and conclusions of law in support of its CHINS determination, we apply a two-tiered

standard of review. *Parmeter v. Cass Cnty. DCS*, 878 N.E.2d 444 (Ind. Ct. App. 2007).

First, we consider whether the evidence supports the findings, and second, whether the

findings support the judgment. *Id.* We will not set aside the findings or judgment unless

they are clearly erroneous. *Id.* Findings are clearly erroneous when the record contains

no facts to support them either directly or by inference, and a judgment is clearly

erroneous if it relies on an incorrect legal standard. *Id.* While we defer to the juvenile

court's findings of fact, we do not do so to its conclusions of law. *Id.* Additionally, we

will not reweigh the evidence; rather, we consider the evidence favorable to the judgment

and draw all reasonable inferences in favor of the judgment. *Id.*

In this case, the DCS alleged that the Children were CHINS pursuant to Ind. Code

Ann. § 31-34-1-1 (West, Westlaw current with all 2014 Public Laws of the 2014 Second

---

[3] Unlike the orders adjudicating the Children CHINS, the dispositional orders vary significantly. Specifically, the only dispositional order referencing Father is the order pertaining to Z.G. Mother does not challenge any of the dispositional orders, but Father challenges the order pertaining to Z.G. Therefore, we will cite to that order only.

Regular Session and Second Regular Technical Session of the 118th General Assembly), which provides that a child under eighteen years of age is a CHINS if:

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>     (A) the child is not receiving; and
>     (B) is unlikely to be provided or accepted without the coercive intervention of the court.

"Because a CHINS proceeding is a civil action, the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010).

First, Father takes issue with some of the factual findings supporting the juvenile court's CHINS adjudication. Specifically, Father argues that the trial court's finding that on September 4, 2013, "Jake Townsend, another known past user of drugs, was in the living room at the house" is clearly erroneous. *Father's Appendix* at 6. Father notes that the only reference to Jacob Townsend during the fact-finding hearing was the testimony of Family Case Manager (FCM) Lee Dannacher, who testified that Father told her that he had found the syringes in the garage and believed that they might have belonged to Townsend. Father argues that there was no evidence of Townsend's past drug use or presence at the home on the day of the incident. We note, however, that FCM Dannacher also testified that Mother told her there was another individual in the living room on the date of the incident, and Mother knew that individual used methamphetamine. Considering Father's and Mother's testimony together, it was reasonable for the juvenile

5

court to conclude that Townsend was the individual to whom Mother was referring. In any event, it is clear that the precise identity of the drug user had no bearing on the juvenile court's ultimate judgment; instead, the relevant point was that there was a known drug user present in the home, and this finding is supported by the evidence.

Next, Father argues that the juvenile court's finding that "drug activity was going on at the property where Mother, Father, and all children were residing" is clearly erroneous. *Id.* at 7. In support of this contention, Father argues that although he was found in possession of methamphetamine and two syringes, the record reflects that he told FCM Dannacher that he found the items in the garage. According to Father, "[t]he record does not reveal whether the syringes fell out of someone's pocket into the garage, whether they had been hidden there by someone, or whether they were part of ongoing drug activity." *Father's Brief* at 11. Father also notes that Mother never observed anyone using drugs anywhere on the property. Father's arguments in this regard are nothing more than a request to reweigh the evidence. The record establishes that Father has a history of methamphetamine use. On the date in question, Mother confronted Father because she believed he was using drugs again. Mother told FCM Dannacher that she was suspicious because she knew how Father behaved when he was using drugs—he became distant and moody—and because a number of Father's friends who had serious drug histories were spending a lot of time with Father in a garage of the residence. When police arrived on the scene, Father was found to be in possession of methamphetamine and two syringes, and he was ultimately charged with possession of methamphetamine, possession of a syringe, and maintaining a common nuisance. This evidence was more

6

than sufficient to support a finding by the preponderance of the evidence that illegal drug activity was occurring on the property.

Finally, Father takes issue with the juvenile court's finding that "Mother and Father have engaged in arguments in the past, including one that was so heated that Father hit the hood of Mother's vehicle[.]" *Father's Appendix* at 7. Father concedes that this finding is supported by the evidence. He argues, however, that the finding is "irrelevant", apparently because such behavior is "not uncommon". *Father's Brief* at 11, 12. We disagree. The juvenile court's finding was undoubtedly relevant to its consideration of the volatility of the relationship between Mother and Father. While the finding standing alone might be insufficient to support a CHINS adjudication, it was considered along with evidence of the much more serious altercation between Mother and Father that occurred on September 4, 2013. Father's argument in this regard is essentially that the trial court attributed too much weight to this finding. In other words, it is a request to reweigh the evidence, which we will not do on appeal.

Next, both Mother and Father argue that the juvenile court's CHINS adjudication was not supported by sufficient evidence. They first argue that the juvenile court's finding that the Children's mental and physical conditions were seriously impaired or endangered as a result of the parents' failure to provide necessary shelter and supervision was not supported by the evidence. *See* I.C. § 31-34-1-1. In this case, the juvenile court found that the Children's physical or mental condition was seriously impaired due to Mother's and Father's failure to provide a living environment free from domestic violence and illegal drug use. Father argues that this finding is unsupported by the

evidence because the "DCS failed to prove illegal drug use." *Father's Brief* at 13. As we explained above, however, the juvenile court's finding that illegal drug activity was taking place at the residence was not clearly erroneous. Father also argues that even if there is evidence of illegal drug use, there is no evidence that Z.G. was seriously endangered thereby. We disagree. The evidence presented established that known drug users were frequenting the property and spending time with Father. At the time of his arrest, Father was in possession of methamphetamine and two syringes, and he was ultimately charged with possession of methamphetamine, possession or a syringe, and maintaining a common nuisance, in addition to domestic battery. Although there is no evidence that Z.G. or the other Children directly witnessed any drug use, this evidence is sufficient to establish that they were seriously endangered by the drug activity in the home.

Father also challenges the juvenile court's finding that Z.G.'s mental or physical condition was seriously impaired or endangered as a result of his exposure to domestic violence in the home. Father argues that there is no specific evidence that Z.G. witnessed any domestic violence or was harmed or endangered by virtue of his presence in the home at the time of the September 4, 2013 incident. As an initial matter, we note that our Supreme Court has acknowledged that a child's exposure to domestic violence can support a CHINS finding. *In re N.E.*, 919 N.E.2d 102; *see also In re E.M.*, 4 N.E.3d 636 (Ind. 2014) (discussing the negative effects of domestic violence upon children); *In re S.W.*, 920 N.E.2d 783 (Ind. Ct. App. 2010) (affirming CHINS finding based, in part, on child's statement that domestic violence had been occurring in the household). As for

8

Father's assertion that Z.G. did not witness the violence, we note that Father told FCM Dannacher that the Children were present when Mother threatened to harm Father with a knife, Father retrieved a knife from the kitchen, gave it to Mother, and told her to hurt him. At that point, Mother sent Z.G. and J.C. upstairs, but Father told FCM Dannacher that he believed the Children would have heard the rest of the fighting. This evidence is more than sufficient to establish that domestic violence occurred in the presence of all three of the Children.

As for Father's contention that the evidence does not support a finding that the Children were harmed by the domestic violence, we note that the CHINS statutes do not require the juvenile court and the DCS to wait until a child is physically or emotionally harmed to intervene; rather, a child may be determined to be a CHINS if his or her physical or mental condition is endangered. *In re R.P.*, 949 N.E.2d 395 (Ind. Ct. App. 2011). FCM Dannacher testified concerning the ways in which children are impacted by domestic violence. Specifically, she testified that there is a risk that they could be accidentally injured during an altercation or that they may attempt to intervene to protect one parent or another. She also noted that child witnesses to domestic violence suffer emotional distress, and that even very young children may experience a physiological fight-or-flight response that may have a negative impact on brain development. *See In re E.M.*, 4 N.E.3d at 644 (explaining that children "as young as fifteen months exhibit behavioral disturbances from spousal violence"). Under these facts and circumstances, we cannot conclude that the juvenile court's finding that the Children's physical or

mental health was seriously endangered due to their exposure to domestic violence in the home was clearly erroneous.

For her part, Mother does not seem to dispute that the Children were endangered. Instead, she argues that "it is unclear what more Mother could have done to supply her Children with the necessary supervision." *Mother's Brief* at 5. Mother asserts that she was aware that Father had a history of drug use and that she allowed him to live with her only when she believed he was not using drugs.[4] She states further that when she became suspicious that Father was using drugs again, she immediately told him to leave and that "when [Father] refused to do so, Mother sent the children upstairs to safety in their bedrooms and called 9-1-1 for help." *Id.* Essentially, Mother argues that even if the Children were endangered, it was not her fault.

As an initial matter, Mother's focus on her culpability or lack thereof is misplaced. Our Supreme Court has explained that "[t]he purpose of the CHINS adjudication is to 'protect the children, not punish parents.'" *In re K.D.*, 962 N.E.2d 1249, 1255 (Ind. 2012) (quoting *In re N.E.*, 919 N.E.2d at 106). Indeed, "sometimes a child can be adjudicated a CHINS through no fault of the parent[.]" *Id.* In any event, Mother ignores a number of facts supporting a conclusion that she was at least partially responsible for the events giving rise to the juvenile court's CHINS adjudication. Specifically, Mother

---

[4] Mother repeatedly asserts that Father completed a drug rehabilitation program before she allowed him to move back into the home with her and the Children. This assertion is unsupported by the record. We note that Mother cites a page of the transcript wherein FCM Dannacher testified that Mother told her that Father had "spent some time in Mentone." *Transcript* at 18. There is no evidence suggesting that Mother or FCM Dannacher was referring to a drug rehabilitation facility. Indeed, FCM Dannacher later testified that Mother had told her that Father had "moved to Mentone for . . . a period of months." *Id.* at 32. Thus, it appears that Father had moved to the town of Mentone, Indiana. There is no indication that he participated in, much less successfully completed, drug rehabilitation treatment.

10

disregards the evidence establishing that she threatened to hurt Father with a knife in the presence of all three children, and that she punched Father in the face in the presence of H.H. and within the hearing of the J.C. and Z.G.

Mother and Father next challenge the juvenile court's finding that the Children need care, treatment, or rehabilitation that they are not receiving and that is unlikely to be provided or accepted without the coercive intervention of the court. *See* I.C. § 31-34-1-1. In this case, the juvenile court found that it was not currently in the Children's best interests to reside in the same home as Father, and that the juvenile court was "not convinced that Mother will not begin residing with Father yet again unless there is continued DCS supervision." *Father's Appendix* at 7-8. In light of the evidence concerning Father's drug use and criminal activity, the juvenile court's conclusion that it was not currently in the Children's best interests to reside in the same home with him is not clearly erroneous. We reach the same conclusion with respect to the juvenile court's finding that Mother was likely to allow Father to move back in unless there was continued DCS supervision. Notably, a no-contact order entered as part of the criminal proceedings against Father was dropped at Mother's request. Moreover, although Mother testified that there were no plans for Father to move back in, she admitted that she was speaking to Father and had seen him a couple of times in the two weeks leading up to the fact-finding hearing.

In sum, the Children need a safe and appropriate home free of domestic violence and illegal drug use. The juvenile court's finding that they were unlikely to receive the

11

care they need without the court's intervention was not clearly erroneous. Accordingly, we affirm the CHINS adjudications.[5]

2.

Next, Father argues that the dispositional order is not supported by sufficient factual findings. I.C. § 31-34-19-10 (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session and Second Regular Technical Session of the 118th General Assembly) provides that a CHINS disposition decree must be accompanied by written findings and conclusions on the record concerning the following:

> (1) The needs of the child for care, treatment, rehabilitation, or placement.
> (2) The need for participation by the parent, guardian, or custodian in the plan of care for the child.
> (3) Efforts made, if the child is a child in need of services, to:
>> (A) prevent the child's removal from; or
>> (B) reunite the child with;
>> the child's parent, guardian, or custodian in accordance with federal law.
> (4) Family services that were offered and provided to:
>> (A) a child in need of services; or
>> (B) the child's parent, guardian, or custodian;
>> in accordance with federal law.
> (5) The court's reasons for the disposition.

Father argues that the juvenile court's dispositional order "do[es] not comply with any aspect" of the statute. *Father's Brief* at 18. We disagree.

In the dispositional order regarding Z.G., the juvenile court found that Z.G. needed care, treatment, and rehabilitation because he had been found to be CHINS. Furthermore,

---

[5] Mother and Father also note that Mother testified that the DCS did not provide her with services prior to the entry of the dispositional order despite the fact that she repeatedly contacted the DCS in an effort to begin services. They argue that this is evidence that no coercive intervention was necessary. This argument is simply a request to reweigh the evidence and draw inference unfavorable to the judgment, which we will not do on appeal.

12

the dispositional order incorporated the predispositional report, *see* I.C. § 31-34-19-10(b) (providing that "[t]he juvenile court may incorporate a finding or conclusion from a predispositional report as a written finding or conclusion upon the record in the court's dispositional decree"), which further provided that "DCS became involved due to domestic violence between [Mother] and [Father]. There are also issues related to illegal drug use by [Father]." *Father's Appendix* at 66. Thus, the dispositional order included sufficient findings concerning Z.G.'s need for care, treatment, rehabilitation, or placement.

With respect to the need for parental participation, the dispositional order contained the following findings:

> Participation by the parent, guardian or custodian in the plan of care for the child is necessary to:
> (1) increase the parent(s) ability to provide proper care, treatment, and supervision;
> (2) increase the parent(s) ability to have a stable and nurturing parent-child relationship;
> (3) allow the child to maintain relationship(s) with parent(s), siblings, and/or extended family.

*Mother's Appendix* at 135. Notwithstanding Father's arguments to the contrary, these findings are sufficient to explain Mother's and Father's need for participation. *See, e.g.*, *In re A.I.*, 835 N.E.2d 798, 814 (Ind. Ct. App. 2005) (concluding that a finding that "there is a need for participation by the parents which appears to be forthcoming" was a sufficient finding concerning the need for parental participation), *trans. denied*.

No findings were necessary concerning removal from or reunification with Z.G.'s parent, guardian, or custodian because although wardship was awarded to the DCS, Z.G.

remained at all times in Mother's care. To the extent Father argues that findings were necessary to support the juvenile court's "removal" of Z.G. from his care and its efforts to "reunite" Z.G. with Father, we note that there is no indication that Z.G. was in Father's custody to begin with. Indeed, the record indicates that Z.G. has always been in Mother's custody, and that Father moved into the residence just one month prior to the domestic violence incident giving rise to the CHINS petition at issue in this case. Even Father refers to Mother as "the custodial parent[.]" *Father's Brief* at 15.

We acknowledge that the dispositional order makes no mention of family services offered prior to the entry of the dispositional order. This is apparently attributable to the fact that no family services were provided prior to the entry of the order. We note, however, that the predispositional report lists "Food Stamps" and "Medicaid" under the heading "Services Available Prior to Current Proceedings". *Father's Appendix* at 72. Finally, when viewing the dispositional order and predispositional report together, the reasons for the juvenile court's disposition are clear: Z.G. and the other Children had been exposed to domestic violence in the home and Father was engaged in illegal drug activity on the property, and the juvenile court determined that continued DCS supervision was necessary to ensure that they were no longer exposed to these risks.

For all of these reasons, we conclude that the juvenile court's dispositional order satisfied the requirements of I.C. § 31-34-19-10. We note further that this court has concluded that a dispositional order containing far fewer findings was sufficient for the purposes of the statute. For example, in *In re A.I.*, 835 N.E.2d at 814, the dispositional order at issue read in its entirety as follows:

14

> Court finds that the child has a special need for care, that there is a need for treatment and rehabilitation; there is a need for participation by the parents which appears to be forthcoming; efforts made to reunite the family have been unsuccessful to date; family services offered and provided have been reasonable; child remains a child in need of services; child is made a ward of Vanderburgh Office of Family and Children with placement [not] with the mother; this placement is in the least restrictive, most appropriate, and in the child's best interest.

This court held that "[t]he trial court's order, while sparse, substantially complies with the statutory requirements." *Id.* As the dispositional order in this case contains far more expansive and specific findings, particularly when read in conjunction with the predispositional report adopted therein, we cannot conclude that the dispositional order was deficient for the purposes of I.C. § 31-34-19-10.

Father also argues that two conditions set forth in the dispositional order were invalid. Specifically, Father takes issue with the juvenile court's placement of Z.G. with Mother instead of Father, as well as the juvenile court's order requiring Father to "contact the DCS every business day by 9am [sic] (unless he is enrolled in an inpatient rehab program) to determine if he must present to the DCS office for a drug screen." *Father's Appendix* at 28. We note that both of these conditions were recommended in the predispositional report. At the dispositional hearing, the juvenile court asked whether Father had any concerns about the report, and Father's counsel ultimately responded that he did not. Because Father agreed to the entry of these conditions, he cannot now assert that they were error. *See Robey v. State*, 7 N.E.3d 371, 380 (Ind. Ct. App. 2014) (explaining that under the doctrine of invited error, "a party may not take advantage of an

error that she commits, invites, or which is the natural consequence of her own neglect or misconduct" (citation omitted)), *trans. denied*.

In any event, both of the conditions are amply supported by the evidence. With respect to Z.G.'s placement with Mother, Father argues that placement with Mother violates I.C. § 31-34-19-6 (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session and Second Regular Technical Session of the 118th General Assembly), which provides as follows:

> If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that:
> (1) is:
>     (A) in the least restrictive (most family like) and most appropriate setting available; and
>     (B) close to the parents' home, consistent with the best interest and special needs of the child;
> (2) least interferes with family autonomy;
> (3) is least disruptive of family life;
> (4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and
> (5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.

Father argues that "placing Z.G. solely with Mother is not the least restrictive and most appropriate setting." *Father's Brief* at 22. But Father's argument in this regard is premised entirely on his assertion that the DCS failed to establish that he used illegal drugs or committed domestic violence in the presence of Z.G. and the other children. We have already rejected this argument. Moreover, at the dispositional hearing, Father indicated that he was planning to enter an inpatient drug treatment facility and would thereafter move into his father's home. Accordingly, it is apparent that Father was not available to take custody of Z.G. at the time of the dispositional hearing, and it is not

16

clear if he will have appropriate housing for Z.G. in the foreseeable future. Additionally, as we explained above, Mother is Z.G.'s custodial parent. Father moved in with Mother and the Children only one month prior to the events giving rise to the CHINS determination in this case. This evidence is more than sufficient to establish that placement with Mother is the least restrictive and most appropriate setting available for Z.G.

With respect to the condition requiring Father to contact the DCS by 9:00 a.m. every business day (provided he is not participating in an inpatient drug treatment) to determine if he must present himself for a drug screen, we note that Father cites I.C. § 31-34-20-3 (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session and Second Regular Technical Session of the 118th General Assembly), and asserts that "[n]either that statute not any other Indiana state authorizes a juvenile court to require a parent in a CHINS case to call DCS on every business day before 9 a.m." *Father's Brief* at 24. We disagree. I.C. § 31-34-20-2 specifically provides that the juvenile court may order a parent to "[o]btain assistance in fulfilling the obligations as a parent, guardian, or custodian." When a parent has problems with substance abuse, participating in drug screens can assist the parent to remain drug-free, which in turn helps him or her to fulfill parental obligations. Even Father concedes that "random drug testing would be appropriate if DCS proved drug use by Father[.]" *Father's Brief* at 24. As we have already explained, the DCS proved by a preponderance of the evidence that Father was using illegal drugs. To the extent Father argues that the daily call requirement is too onerous, he has not directed our attention to any evidence in the record indicating that the

17

requirement would be unduly burdensome to him. For all of these reasons, we cannot conclude that the requirement is unreasonable.

Judgment affirmed.

VAIDIK, C.J., and MAY, J., concur.